**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIAH SHALANE BURLEY, | ) | CASE NO. 4:23-CV-00218-BMB |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BRIDGET M. BRENNAN |
| | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     INTRODUCTION

Plaintiff Mariah Shalane Burley ("Ms. Burley") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). U.S. District Judge Bridget M. Brennan has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.     PROCEDURAL HISTORY

Ms. Burley filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging a disability onset date of November 1, 2020. (Tr. 21, 76-77, 184, 191.)[1] Ms. Burley's applications related to morbid obesity, asthma, depressive disorder, anxiety disorder, and bipolar disorder. (Tr. 24.) Her applications were denied initially and upon

---

[1] The administrative transcript ("Tr.") appears at ECF No. 6 on CM/ECF.

reconsideration. (Tr. 114-23, 132-37.) Ms. Burley requested a hearing before an administrative law judge ("ALJ"). (Tr. 140.) On May 3, 2022, an ALJ held a telephone hearing due to the COVID-19 pandemic. (Tr. 39-67.) Ms. Burley, represented by counsel, and a vocational expert ("VE") testified at the hearing. (*Id.*) The ALJ issued a written decision on May 23, 2022, finding Ms. Burley not disabled within the meaning of the Social Security Act. (Tr. 21-32.) The ALJ's decision became final on December 6, 2022, when the Appeals Council declined further review. (Tr. 1-3.) Ms. Johnson filed a Complaint challenging the Commissioner's final decision on February 5, 2023. (ECF No. 1.) She raises the following assignments of error:

(1) The ALJ erred when he failed to evaluate the opinion of the treating source in accordance with 20 CFR 404.1520c and 416.920c.

(2) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of the totality of Plaintiff's symptoms precluded her from performing substantial gainful activity on a full-time and sustained basis.

(ECF No. 7, PageID#459.)

### III.    BACKGROUND INFORMATION[2]

#### A.  **Personal, Educational, and Vocational Experience**

Ms. Burley was born in 1992, and she was 28 years old on the alleged disability onset date. (Tr. 31.) She is not married and has no children. (Tr. 46, 318.) She lives in an apartment with a roommate. (Tr. 45.) She graduated high school and attended one year of college. (Tr. 46-47, 318.) She completed cosmetology school but never obtained her cosmetology license. (Tr. 47.) She does not have a driver's license. (Tr. 46.) Her past relevant work was employment as a sales clerk, coffee shop counter attendant, and coffee maker. (Tr. 31.)

---

[2] Ms. Burley's argument focus on the ALJ's assessment of her mental impairments, so this summary will only address the evidence involving those impairments.

2

### B. **Relevant Hearing Testimony**

#### 1. *Ms. Burley's Testimony*

Ms. Burley testified that she experiences fluctuations in her weight due to depression. (Tr. 44-5.) Ms. Burley testified that she is unable to work because she has "so much anxiety and paranoia" that makes it difficult to properly remember things. (Tr. 53.) She stated that she did not have patience in terms of dealing with customers and coworkers and that she was "just not … social enough" for most jobs. (*Id.*) She added that she felt so anxious and depressed that she could not find the energy to make it to work on time. (*Id.*) Her current medication regimen consists of Lamictal, Prozac, a daily asthma inhaler, and a rescue asthma inhaler. (Tr. 53-54.)

Ms. Burley stated that her anxiety causes her to be "always thinking," to be "constantly looking over [her] shoulder at work," and to never feel safe. (Tr. 54.) She testified that her depressive episodes limit her patience. (*Id.*) She explained that when she experiences a depressive episode, her ability "to want to do a better job at work and communicate with a person like [her] coworkers is not there anymore," which prevents her from being able to properly do her job. (*Id.*) Regarding her concentration, Ms. Burley testified that she gets so distracted with "everything in [her] mind," whether it is an actual issue she is experiencing or "something that is just nonsensical." (Tr. 55.)  This, as Ms. Burley testified, makes it impossible to focus on other work-related tasks such as remembering how to properly stock. (*Id.*)

Ms. Burley's counsel asked her how long she could concentrate before her concentration wanes. (*Id.*) Ms. Burley estimated that she can concentrate for approximately about an hour or two in the morning, but her concentration wanes as the day progresses and depression "starts to set in." (*Id.*) Ms. Burley testified that when watching a 30-minute television program she is unable to focus on it from beginning to end. (*Id.*) She explained that she would not be able to explain to someone

what happened during the show, and that most of the time she would have to stop and rewind the show or ask people around her what happened. (*Id.*)

Ms. Burley stated that it takes her approximately one to two hours to clean her kitchen. (Tr. 56.) She stated that it takes this long because she sometimes becomes physically tired or she just "[does not] feel like doing it." (Tr. 57.) She testified that she experiences depressive episodes where she just lies in bed every couple of days to a week. (*Id.*) She testified that on those days she spends the entire day in bed. (*Id.*) She stated that she often skips therapy or psychiatric appointments due to her mental health conditions. (Tr. 58.)

### 2. *Vocational Expert's Testimony*

The ALJ asked the VE whether a hypothetical individual with Ms. Burley's age, education, and work experience could perform work at the medium exertional level if, in relevant part, limited to simple and routine, repetitive tasks requiring only simple decision-making with no fast-paced production requirements such as assembly line work or piecemeal quotas, capable of adapting to changes in the work environment and changes in work responsibilities or workplace which are explained in advance of implementation and implemented gradually over time, occasional contact with coworkers and supervisors, and no contact with the general public. (Tr. 61-62.) The ALJ also added that once work is assigned, the individual should be able to perform work without working in close coordination with others, and that the tasks should generally require working with things rather than with people. (*Id.*) The VE opined that this individual could not perform Ms. Burley's past relevant work. (Tr. 62.) The VE opined that this individual, however, could perform work as a laundry laborer and candy factory helper. (Tr. 62-63.)

The ALJ asked the VE how a typical employer would tolerate an employee being late to work or having unexcused or unscheduled absences. (Tr. 63.) The VE opined that most employers

would accept one absence per month, which correlates to 12 absences per year. (Tr. 63-64.) The VE testified that an employee who had more absences would be unemployable. (Tr. 64.)

The ALJ also asked the VE the customary number and length of breaks that a typical employer permits during the workday. (*Id.*) The VE opined that typical breaks would be a five- to ten-minute break midway through the first half of the shift, a similar break midway through the second half of the shift, a 20- to 30-minute lunch break during the middle of the shift, and one or two five- to ten-minute restroom or drink breaks. (*Id.*)

The ALJ then asked the VE how a typical employer would tolerate off-task behavior in addition to regularly scheduled breaks. (*Id.*) The VE stated that a typical employer's tolerance for off-task behavior is up to 15 percent of the workday. (*Id.*) Any behavior exceeding this amount would make an individual unemployable. (*Id.*)

Ms. Burley's counsel asked whether requiring an isolated work station would impact an individual's ability to perform competitive employment. (Tr. 65.) The following exchange took place between Ms. Burley's counsel and the VE:

> **[ATTY]:** Got it. Thank you. I wanted to clarify that. If a hypothetical individual were to require an isolated work station, would that impact their ability to perform competitive employment.
>
> **[VE]:** Well, I'm not sure what you mean by an isolated work station. There are only three jobs classified as working in isolation or alone, three jobs out of 12,700 in the DOT. I know one of them is forest fire watcher. But the jobs that I gave would not be performed in tandem or as part of a team, if that's what you mean. Or maybe you could describe isolation.
>
> **[ATTY]:** I'm imagining somebody who is going to need to work without having contact with – we already have taken away the public but as well [as] coworkers and supervisors.
>
> **[VE]:** They would not be able to have any of that type of contact?
>
> **[ATTY]:** Right?

5

[VE]: That person would be unemployable.

(*Id.*)

Ms. Burley's counsel then asked the VE whether an individual could maintain employment if they would be behind the pace of their coworkers by 20 percent. (Tr. 66.) The VE stated that this "may have an impact" but he was not sure if anything less than that would have much of an impact on employment. (*Id.*) The VE stated that this would depend on the individual. (*Id.*) He explained that if this individual did "really good work and was liked by everyone," an employer could overlook this "a little bit." (*Id.*) However, the VE stated that an employee who is behind the pace of her coworker by more than 20 percent would not be acceptable to an employer. (*Id.*)

## C.  <u>Relevant Non-Medical/Medical Opinion Evidence</u>

### 1.  *State Agency Psychological Consultants*

In August 2021, Aracelis Rivera, Ph.D., reviewed Ms. Burley's record at the initial level of consideration. Dr. Rivera opined with respect to Ms. Burley's sustained concentration and persistence capacities and limitations that Ms. Burley would need a structured work setting with focus on standard repetitive tasks that are not based on fast-paced production quotas. (Tr. 84.) Dr. Rivera determined that Ms. Burley had no social interaction limitations. (*Id.*) Regarding Ms. Burley's adaptation limitations, Dr. Rivera opined that Ms. Burley can adapt to routine changes. (*Id.*)

In November 2021, Cindy Matyi, Ph.D., reviewed Ms. Burley's record at the reconsideration level. Dr. Matyi opined that Ms. Burley's condition restricts her capacity for detailed/complex tasks, but she is able to comprehend and remember simple instructions. (Tr. 101.) Regarding Ms. Burley's sustained concentration and persistence capacities and limitations, Dr. Matyi opined that Ms. Burley can carry out simple tasks, maintain attention, make simple

decisions, and adequately adhere to a schedule. (Tr. 102.) Dr. Matyi added that Ms. Burley would

need a relatively isolated workstation and supervisory support when first learning job tasks. (*Id.*)

With respect to social interaction capacities and limitations, Dr. Matyi opined that Ms. Burley is

susceptible to misinterpreting interpersonal nuance, yet she can relate adequately on a superficial

basis in an environment that entails infrequent public contact, minimal interaction with coworkers,

and no over-the-shoulder supervisor scrutiny. (*Id.*) Regarding Ms. Burley's adaptation capacities

and/or limitations, Dr. Matyi opined that Ms. Burley's symptoms would be exacerbated in the face

or perceived stressors, but she can adapt to a setting in which duties are routine and predictable

and in which changes are infrequent, explained in advance, and introduced slowly. (*Id.*) Dr. Matyi

added that Ms. Burley would require supervisory support with goal-setting and planning. (*Id.*)

Accordingly, Dr. Matyi determined that, upon reconsideration review, that the totality of the

evidence supports limitations and residual capacity different from those proposed at the initial

level of consideration. (*See* Tr. 103.)

## 2. *Lindsey Hoppel, N.P.*

In a series of check boxes, Nurse Hoppel rated the severity of Ms. Burley's limitation in

sustained concentration and persistence, understanding and memory, social interaction, and

adaptation. (Tr. 438-39.) Regarding sustained concentration and persistence limitations, Nurse

Hoppel opined that Ms. Burley was seriously limited, but not precluded[3] in her abilities to carry

out very short and simple instructions; perform activities within a schedule; manage regular

attendance and be punctual within customary tolerance; sustain an ordinary routine without special

supervision; complete a normal workday and workweek without interruptions from

---

[3] The form defines "seriously limited, but not precluded" as the "ability to function in th[e] area is less than
satisfactory, but not precluded in all circumstances." (Tr. 438.) The form further explained that the individual would
be limited in her ability to perform the specific activity 15% of the time. (*Id.*)

psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 438.) Nurse Hoppel further opined that Ms. Burley is unable to meet competitive standards[4] in her abilities to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from her psychologically based symptoms. (*Id.*)

Regarding understanding and memory limitations, Nurse Hoppel opined that Ms. Burley is seriously limited but not precluded in her abilities to remember locations and work-like procedures and understand and remember very short and simple instructions, and unable to meet competitive standards in her ability to understand and remember detailed instructions. (Tr. 439.)

Regarding social interaction limitations, Nurse Hoppel opined that Ms. Burley is seriously limited but not precluded in her abilities to interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*) Nurse Hoppel further opined that Ms. Burley is unable to meet competitive standards in her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*)

Regarding adaptation limitations, Nurse Hoppel opined that Ms. Burley is seriously limited but not precluded in her abilities to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. (*Id.*) Nurse Hoppel also opined Ms. Burley is limited but satisfactory in her ability to be aware of normal hazards and take appropriate precautions. (*Id.*)

---

[4] The form defines "unable to meet competitive standards" as "[the] patient cannot satisfactorily perform th[e] activity independently, appropriately, effectively and on a sustained bases in a regular work setting." (Tr. 438.)

Nurse Hoppel noted Ms. Burley's diagnoses were major depressive disorder, mood disorder, and anxiety. (Tr. 438.) Nurse Hoppel indicated that Ms. Burley takes Prozac, Lamictal, and Clonidine, and that she experiences drowsiness and fatigue as side effects from these medications. (*Id.*) Nurse Hoppel wrote the following as the clinical findings supporting the severity of Ms. Burley's mental impairments and symptoms: "PHQ-9 – 16 Moderately Severe Depression." (*Id.*) Nurse Hoppel wrote that Ms. Burley's prognosis was fair. (*Id.*) Nurse Hoppel opined that Ms. Burley would be absent two to three times per week due to her impairments. (Tr. 439.) Finally, Nurse Hoppel opined that Ms. Burley would be off-task 50% of an 8-hour workday due to her symptoms. (*Id.*)

### 3.  *Kenneth Gruenfeld, Psy.D.*

On July 9, 2021, Kenneth Gruenfeld, Psy.D., conducted a consultative psychological examination of Ms. Burley. (Tr. 317.) Ms. Burley stated that she filed for disability benefits because of her medical and mental health issues. (*Id.*) She reported that at her most recent job at a retail store that she was late for work and was not "on top of things." (Tr. 318.) She also stated that when she was last employed that she was not taking medications. (*Id.*) She noted that she had problems with focus and motivation and "[did not] care that much." (*Id.*) She reported problems with depression, and she noted that her depression symptoms were centered on the "current and chronic nature" of her pain and her "fear for her future health." (Tr. 319.) She described sadness, feelings of worthlessness, lack of motivation, lack of energy, anxiety, mania, racing thoughts, lack of focus, distractibility, and isolative behavior. (*Id.*) She reported that she cannot live or travel alone due to her anxiety, and that she experiences panic attacks several times a week or even daily. (*Id.*) She also reported that her anxiety increases with stress or large crowds. (*Id.*) Regarding her daily activities, Ms. Burley reported that she typically spends the day with her roommate, sister,

or boyfriend; tries to "do things in the house" to stay busy; or walks to stay busy. (*Id.*) She stated that "intellectually" she knew how to complete basic household chores, such as cooking, washing dishes, washing clothes, and vacuuming, but she did not help with chores consistently due to her mental health issues. (*Id.*) She also kows how to manage money and pay bills. (*Id.*) She reported that she rarely socialized with others. (Tr. 320.)

On mental status examination, Ms. Burley displayed normal speech, answered all questions, remained on topic, elaborated when requested, and did not need questions repeated to her. (*Id.*) Her affect and mood were appropriate to the situations. (*Id.*) She did not appear nervous during the examination, and she denied experiencing anxiety at the time of the evaluation. (*Id.*) She was oriented to person, place, and time, and she exhibited good concentration. (*Id.*)

Regarding Ms. Burley's abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Gruenfeld opined that Ms. Burley would have "significant struggles to consistently carry out future job tasks." (Tr. 321.) Regarding Ms. Burley's abilities and limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks, Dr. Gruenfeld opined that Ms. Burley would work slower than others due to her issues of focus and motivation, and she would have problems completing multi-step job tasks and a combination of tasks that would require multi-tasking. (*Id.*) With respect to responding appropriately to supervision and to coworkers in a work setting, Dr. Gruenfeld opined that Ms. Burley "should be able to effectively work with others but will struggle during times of high anxiety." (Tr. 322.) Finally, Dr. Gruenfeld opined that, regarding Ms. Burley's abilities and limitations in responding appropriately to pressures in a work setting, stress would trigger Ms. Burley's mental health issues, and the quality and consistency of her future task performance "will worsen as stress heightens." (*Id.*)

10

D. **Relevant Medical Evidence**[5]

Ms. Burley alleged disability due to bipolar disorder, anxiety, and depression. (Tr. 217; *see also* Tr. 243.) She stated that she stopped working on December 11, 2020, because of her conditions. (Tr. 217.)

Ms. Burley received mental health treatment between April 2020 and March 2022. (Tr. 325-401, 408-37.) On April 13, 2020, Ms. Burley reported symptoms of headaches, dizziness, stomach troubles, bowel disturbances, fatigue, insomnia, nightmares, panic, depressed mood, tenseness, loneliness, financial concerns, and a need for order. (Tr. 325.) During assessment, she reported anxiety related to fear of future events and worry related to her "imagined health conditions." (*Id.*) Upon examination, Ms. Burley's appearance was within normal limits. (Tr. 328.) Her mood was anxious, but her affect was full, and her thought content, perception, and judgment were within normal limits. (Tr. 329.) She had partial insight. (*Id.*)

On January 11, 2021, Lindsey Hoppel, N.P., completed a Mental Impairment Questionnaire for Ms. Burley. (Tr. 438.) This Report and Recommendation provides a complete summary of this opinion in the "Relevant Non-Medical/Medical Opinion Evidence" section.

On July 9, 2021, Kenneth Gruenfeld, Psy.D., conducted a consultative psychological examination of Ms. Burley. (Tr. 317.) This Report and Recommendations provides a complete summary this opinion in the "Relevant Non-Medical/Medical Opinion Evidence" section.

---

[5] The Initial Order states, "Any facts recited in support of the "Argument" or "Analysis" section of the brief must also be set forth in the Facts" section of the brief." (ECF No. 5, PageID#15.) Here, Ms. Burley's counsel, in violation of this Court's order, did not set forth all the facts relevant to her argument in the "Statement of the Facts" section of her brief. Rather, the argument section of her brief contains swaths of factual evidence that she did not detail previously. (*See, e.g*, ECF No. 7, PageID#460-61 (describing the medical opinions in the "Facts" section rather than the treatment notes from the claimant's counseling appointments), PageID#467-68 (detailing specific treatment notes from the claimant's counseling appointments in her "Law and Argument" section that were not discussed in the "Statement of the Facts" section of the brief), PageID#472 (same)). Courts in the Northern District of Ohio have previously warned Ms. Burley's counsel about this practice. *See, e.g.*, *Garcia v. Comm'r of Soc. Sec.*, No. 1:22-cv-1044, 2023 WL 2333520, at *7 n.11 (N.D. Ohio Jan. 27, 2023) (Grimes, M.J.); *Tollon v. Comm'r of Soc. Sec.*, No. 1:21-CV-1507, 2022 WL 2610518, at *2 n.5 (N.D. Ohio May 3, 2022) (Greenberg, M.J.).

At a January 28, 2021, telehealth session, Ms. Burley reported that "overall things [were] going better for her." (Tr. 334.) She believed her psychotropic medications were helpful in managing her mood and anxiety symptoms. (*Id.*) She said her holidays were very enjoyable and she was able to spend time with family. (*Id.*) Her biggest concern involved trust issues related to her long-distance romantic relationship. (*Id.*)

On March 4, 2021, Ms. Burley reported that she "[was not] doing the best." (Tr. 339.) She forgot to make follow-up appointments and had run out of Celexa. (*Id.*) She stated that "overall she fe[lt] very good" when taking Celexa. (*Id.*) She felt her anxiety had increased "due to some things going on in her life." (*Id.*) She admitted Clonidine helped with her anxiety, but she felt it was not strong enough. (*Id.*) She denied any side effects from her medication and manic episodes. (*Id.*) She further reported that her moods "[were] mostly stable." (*Id.*)

On March 30, 2021, Ms. Burley reported that "things have been very emotional and all over the place lately." (Tr. 348.) She attributed this to her brother's recent hospitalization. (*Id.*) At a March 30, 2021, telehealth appointment, Ms. Burley reported that she had an increase in depression symptoms over the past few weeks, but she had started taking walks again and was trying to be more consistent with her daily schedule. (Tr. 350.) Her provider noted that "this seem[ed] to be helpful so far." (*Id.*)

On April 28, 2021, Ms. Burley noted she was taking steps to build a more positive lifestyle and was walking three times a week. (Tr. 358.) She stated that she was "looking to enroll in online classes" in the fall and wanted to major in art education, but she was having trouble finding colleges that offered that course of study. (*Id.*)

At a May 21, 2021, telehealth appointment, Ms. Burley reported that "things are not going good right now," and that she wanted to discuss a new mood stabilizer. (Tr. 360.) She did not

believe her anti-depressants worked to alleviate her bipolar disorder symptoms. (*Id.*) On July 6, 2021, Ms. Burley reported that "overall things have been going better for herself and within her interpersonal relationships." (Tr. 372.) Another July 6, 2021, treatment note indicates that Ms. Burley again reported that "things have been going better" and that she had plans to go to Kennywood and then Cleveland for a week with family and a friend. (Tr. 375.) She stated that she did not see much difference with her new psychotropic medication and wanted to try a nonprescription option. (*Id.*)

On September 23, 2021, Ms. Burley stated that she was "doing okay." (Tr. 389.) She felt that she needed an increase in her Lamictal. (*Id.*) She explained that her moods were shifting, but she felt Lamictal was beneficial. (*Id.*) She stated that her biggest concern was an inability to focus or concentrate. (*Id.*) She also reported racing thought and paranoia. (*Id.*) Ms. Burley reported that Prozac helped her depression symptoms. (*Id.*)

On October 21, 2021, Ms. Burley stated that she was doing "very well." (Tr. 395.) Her moods and depression were stable, but she continued to struggle with concentration and focus. (*Id.*) Ms. Burley missed her therapy appointment, which was her second no-show appointment. (*Id.*) She reported she could not remember when it was and admitted that she would still like to pursue testing. (Tr. 396.) She reported she was sleeping okay and denied suicidal/homicidal intent. (*Id.*) She also reported that she was satisfied with her current medication regimen at the time. (*Id.*)

On January 4, 2022, Ms. Burley attended a telemedicine appointment with Theodore D. Chrobak, D.O. Dr. Chrobak noted that Ms. Burley has a history of depression, anxiety, and insomnia, but also noted that she had "good results [with] medicines." (Tr. 406.)

At a January 6, 2022, appointment, Ms. Burley reported that she was the "happiest [she has] been for awhile" because she was no longer involved in a long-distance relationship. (Tr.

408.) Her major concerns were worries about her younger brother, COVID, and climate change. (*Id.*) She stated that she had been very anxious lately and needed to use self-calming techniques. (*Id.*)

On January 11, 2022, Ms. Burley attended a follow-up medication management session. (Tr. 413.) She had not been seen for medication management since October, but she reported that she was not out of medication because she was not taking her medication consistently. (*Id.*) She stated that she felt her medication regimen "works pretty good for her." (Tr. 413.) Ms. Burley remarked that she had been feeling down lately, but she attributed it more to "situational things" and the time of year. (*Id.*) Ms. Burley's moods had been stable. (*Id.*) She was slightly more depressed but not manic at all. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ first found that Ms. Burley met the insured status requirements of the Social Security Act through March 31, 2022. (Tr. 23.) The ALJ then determined that Ms. Burley has not engaged in substantial gainful activity since November 1, 2020, the alleged disability onset date. (Tr. 23-24.) The ALJ next determined that Mr. Burley has the following severe impairments: morbid obesity; asthma; depressive disorder; anxiety disorder; and bipolar disorder. (Tr. 24.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 24-26.) The ALJ determined that Ms. Burley can perform work at the medium exertional level, except that she can occasionally climb stairs and ramps; occasionally kneel; occasionally crouch; occasionally crawl; and must avoid concentrated exposure to extreme heat and cold and irritants such as concentrated fumes, odors, dust, gases, or poor ventilation. (Tr. 26.) In addition, the ALJ determined that Ms. Burley should be limited to simple, routine, and repetitive tasks requiring only

14

simple decision-making with no fast-paced production requirements, such as assembly line work or piecemeal quotas; have no contact with the general public; and be limited to occasional contact with coworkers and supervisors. (*Id.*) The ALJ further determined that Ms. Burley is capable of changes in the work environment, meaning changes in work implemented gradually over time. (*Id.*) The ALJ also determined that once work is assigned to Ms. Burley, the work should be able to be performed without working in close coordination with others andthe tasks should require working with things rather than people. (*Id.*)

The ALJ next determined that Ms. Burley is unable to perform any past relevant work. (Tr. 30.) The ALJ found that the transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a "not disabled" finding for Ms. Burley. (Tr. 31.) Considering Ms. Burley's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Burley can perform, such as employment as a laundry worker and factory helper. (Tr. 31-32.) Accordingly, the ALJ concluded that Ms. Burley was not disabled under the meaning of the Social Security Act since her application filing date. (Tr. 32.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

15

*Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. **Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. **Analysis**

#### 1. *Substantial Evidence Supports the Evaluation of the Opinion Evidence.*

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he

considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[6]

According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

In the instant case, the ALJ did not find Nurse Hoppel's opinion persuasive. He stated the following:

> Ms. Hoppel provided limited support for the assessed limitations, generally completing a simple check box form with the only other notations being a list of the claimant's diagnoses, medications, and medication side effects of drowsiness and fatigue. The severity of limitations assessed by Ms. Lindsey are not consistent with the claimant's treatment history, which consistently indicates the claimant has required no more than conservative mental health treatment throughout the entire period at issue with no inpatient or associated emergent mental health treatment. Additionally, Ms. Hoppel's own treatment records reflect that the claimant's conditions are improved with medications and generally stable. Exhibit 6F. Accordingly, the undersigned finds the severity of limitations assessed by Ms. Hoppel are not persuasive.

(Tr. 30.)

The ALJ addressed the supportability factor as required under the regulations. Supportability is defined as "[t]he more relevant the objective medical evidence and supporting explanations **presented by a medical source** are to support his or her medical opinion[ ]...the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). As

---

[6] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

reproduced above, the ALJ found Nurse Hoppel's opinion unsupported because it was a checkbox form. This evaluation is supported by substantial evidence.

As a general matter, an ALJ may properly afford little weight to a medical source's checkbox form of functional limitations when it does not cite clinical test results, observations, or other objective findings. *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (collecting cases). Here, Nurse Hoppel opined on a checkbox form that Ms. Burley had a range of severe limitations. (*See generally* Tr. 438-39.) The only explanation that Ms. Hoppel provided was a list of Ms. Burley's diagnoses of major depressive disorder, mood disorder, and anxiety; a list of medications and their side effects; a description of the clinical findings stating "PHQ-9 - 16 Moderately Severe Depression"; and a prognosis stating "fair." (Tr. 438.) Nurse Hoppel offers little, if any, explanation for her assessed limitations on the checkbox portion of the opinion form; her assessment of how many days per week Ms. Burley would be absent from work; or how often Ms. Burley's symptoms would cause her to be off task from performing job tasks. (Tr. 439.)

Here, the limited explanation that Nurse Hoppel provided does not change the checkbox nature of her opinion. Indeed, numerous courts in the Northern District of Ohio have concluded that forms with similar explanations are checkbox forms. *See, e.g.*, *Harcula v. Comm'r of Soc. Sec.*, No. 1:22-cv-01950-CEF, 2023 WL 6050291, at *14 (N.D. Ohio Aug. 31, 2023), *report and recommendation adopted*, 2023 WL 6049326 (N.D. Ohio Sept. 15, 2023) (finding medical provider's opinion was a checkbox form where explanations consisted of a list of the claimant's diagnoses; a list of medications and their corresponding dosages; a description of the clinical findings, stating "obsessive thoughts and high anxiety interfere with concentration, mood [,] and decision making"; and a prognosis stating "crisis intervention 2016"); *Nussbaum v. Comm'r of Soc. Sec.*, No. 5:22-CV-01763-SL, 2023 WL 5353142, at *9 (N.D. Ohio Aug. 1, 2023), *report and*

*recommendation adopted*, 2023 WL 5352398 (N.D. Ohio Aug. 21, 2023) (finding medical source's opinion's explanation that consisted of a list of claimant's diagnoses and a statement that some diagnoses would pose limitations that would interfere with his ability to sustain work was a checkbox form); *Duke v. Comm'r of Soc. Sec.*, No. 21 CV 39, 2022 WL 1075171, at *4 (N.D. Ohio Apr. 11, 2022) (finding that medical source's form was a checkbox form where the form included checkboxes and listed claimant's asthma and POTS diagnoses; described treatment as "medications;" listed symptoms; and stated that the medical findings were a "fast heart rate and low blood pressure.").

The ALJ also addressed the consistency factor. Consistency is defined as "[t]he more consistent a medical opinion[ ]...is with the evidence from other medical sources and nonmedical sources in the claim...the more persuasive the medical opinions(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(2). Here, the ALJ found Nurse Hoppel's opinion was inconsistent because Nurse Hoppel's own treatment records reflect that Ms. Burley's conditions improved with medications and are generally stable. (Tr. 30.)

Ms. Burley primarily challenges the ALJ's conclusion that Nurse Hoppel's treatment records reflect that Ms. Burley's conditions improved with medications and are generally stable. (*See* ECF No. 7, PageID#467-68.) In support of this argument, Ms. Burley points to records from April 2020 to January 2022 that she contends support a different conclusion. These records reflect instances where she reported symptoms stemming from her conditions, issues with her medications, and issues with her moods. (*See* Tr. 325, 332, 339, 345, 350, 362, 366, 375, 389, 395, 408.) A review of the ALJ's decision and the longitudinal record, however, suggests that the ALJ's conclusion is supported by substantial evidence.

While Ms. Burley presents citations to the record where she sometimes reported unstable mood and issues with her medications, the ALJ's decision reflects consideration of such issues. (*See generally* Tr. 27-28.) Indeed, upon review of the record as a whole, I cannot conclude that the ALJ's overall conclusion that Ms. Burley's "conditions are improved with medications and generally stable" (Tr. 30) was unreasonable. And the ALJ pointed to evidence in his summary of the record that bolsters this conclusion. For example, at a January 28, 2021, session, Ms. Burley reported that "overall things have been going better for her" and her medications were helpful in managing her mood and anxiety symptoms. (Tr. 27-28; *see* Tr. 334.)[7] On March 4, 2021, despite Ms. Burley reporting she was not "doing the best," she stated that she "overall feels very good" when she takes Celexa. (Tr. 28; *see* Tr. 339.) She did not feel like her Clonidine was strong enough, but she admitted that this medication did help with her anxiety. (Tr. 339.) She also reported that she felt her moods were "mostly stable." (*Id.*) The ALJ also noted that Ms. Burley reported at a January 11, 2022, session, that her medication regimen worked "pretty good for her." (Tr. 28; *see* Tr. 413.) While she reported feeling down, she attributed this feeling more to "situational things," as well as the time of year. (Tr. 413) Her prescriber noted that her moods have been stable and that, while slightly more depressed, she was not manic at all. (*Id.*).

And some of Ms. Burley's citations omit portions of the record that bolster the ALJ's conclusions rather than Ms. Burley's.  For example, Ms. Burley points to a report from her March 4, 2021, appointment where she felt her anxiety was increased. (Tr. 339.) She, however, attributed this increase to "some things going on in her life." (*Id*.) Notably, she admitted Clonidine was helpful with her anxiety, despite feeling this medication was not strong enough. (*Id.*) She even reported that she felt her moods were mostly stable. (*Id.*) And while Ms. Burley cites her report at

---

[7] The same treatment note included that her mood affect had "notable change," which was described as a "decrease in mood and anxiety symptoms." (Tr. 334.)

a July 26, 2021, appointment that she did not "see much difference with [her] new psychotropic medication," she omits that at the same appointment she reported that "things have been going better." (Tr. 375.)

Ms. Burley also notes that at her September 23, 2021, medication management appointment, she reported that her "moods [were] still shifting," an inability to focus, and paranoia. (Tr. 389.) But that same treatment note shows that Ms. Burley believed Lamictal was beneficial and should be increased. (*Id.*) Significantly, she even reported that Prozac seemed to help with her depression symptoms. (*Id.*) She also noted that she reported at an October 21, 2021, appointment that she was still struggling with focus and concentration. (Tr. 395.) But Ms. Burley also reported at this same appointment that she was "doing very well" and felt that her "moods and depression [were] stable." (*Id.*) She even reported satisfaction with her current medication regimen. (Tr. 396.) Thus, considering the longitudinal record and some of Ms. Burley's own citations to the record, the ALJ's conclusion that Ms. Burley's "conditions are improved with medications and generally stable" is supported by substantial evidence. (Tr. 30.)

While Ms. Burley highlights aspects of the treatment notes that she argues may lead toward a different conclusion, the ALJ offered ample reasoning when articulating why Nurse Hoppel's opinion was not supported by or consistent with the medical record. (Tr. 30.) Thus, the ALJ complied with the regulations by assessing the opinion's supportability and consistency as required by the regulations. 20 C.F.R. § 404.1520c ("The most important factors we consider when we evaluate the persuasiveness of medical opinions or prior administrative medical findings are supportability…and consistency…"). And, reading the decision as a whole and with common sense, the ALJ articulated substantial evidence supporting his conclusion, which was contrary to Ms. Burley's preferred conclusion. "[W]hen a record presents substantial evidence supporting two

22

contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 960 (N.D. Ohio June 24, 2023) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

The ALJ further concluded that Nurse Hoppel's opinion was not consistent with the remainder of Ms. Burley's treatment history, which "consistently indicates [she] has required no more than conservative mental health treatment throughout the entire period at issue with no inpatient or associated emergen[cy] mental health treatment." (Tr. 30.) The Social Security regulations permit for the ALJ to consider "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(3)(c)(5), 416.920c(3)(c)(5). A review of the record supports—and Ms. Burley does not contest (ECF No. 7, PageID#467-68)—the ALJ's reasoning. Thus, Ms. Burley does not establish error with respect to the ALJ's assessment of Nurse Hoppel's opinion.

Although not identified by her assignment of error heading, Ms. Burley raises an additional argument concerning the ALJ's evaluation of the findings of the state agency psychological consultants.[8] She raises two sub-claims. First, Ms. Burley notes that the state agency consultant at the reconsideration level opined that she would need an isolated workstation, supervisory support when learning job tasks, and no over-the-shoulder supervisor scrutiny. (Tr. 102, 111.) This state

---

[8] This Court's Initial Order states that the parties' arguments "shall be preceded by headings identifying the claimed errors." (ECF No. 5, PageID#14) (emphasis removed). Here, Ms. Burley's assignment of error heading only indicates that she challenges the treatment of the treating source opinion, **not** the treatment of the state agency opinions or the ALJ's compliance with SSR 96-8p. (*See* ECF No. 7, PageID#459.) Courts in the Northern District of Ohio have previously cautioned Ms. Burley's counsel to refrain from combining disparate challenges and arguments regarding the sequential disability evaluation together in a single assignment of error. *See, e.g.*, *Dellarco v. Comm'r of Soc. Sec.*, No. 4:22-CV-00962-PAB, 2023 WL 3324833, at *9 n.6 (N.D. Ohio Apr. 20, 2023), *report and recommendation adopted*, 2023 WL 3320142 (N.D. May 8, 2023); *Overstreet v. Comm'r of Soc. Sec.*, No. 1:21-CV-2062, 2022 WL 15524729, at *11 n.9 (N.D. Ohio Oct. 11, 2022) (citing Case No. 1:21-cv-00556, Doc. 19, at 34 n.7 (filed 3/2/2022); Case No. 5:20-cv-02850, Doc. 19, at 34 n.5 (filed 2/2/2022); Case No. 5:20-cv-01340, Doc. 21, at 26 n.9 (filed 8/16/2021); Case No. 1:20-cv-01186, Doc. 21, at 25 n.8 (filed 8/16/2021)), *report and recommendation adopted*, No. 1:21CV2062, 2022 WL 15522981 (N.D. Ohio Oct. 27, 2022)).

agency consultant also opined that Ms. Burley could relate adequately on a superficial basis with infrequent public contact and minimal interaction with coworkers. (Tr. 102, 111.) Ms. Burley argues that the ALJ erred in concluding that the findings of the state agency consultants were persuasive but then failed to incorporate them into the RFC findings.

Ms. Burley next argues that the VE testified that if a person would be slower than their coworkers by 20 percent, they would not be able to retain employment. (ECF No. 87, PageID#468-69 (citing Tr. 66.)). She contends that these questions were based on the findings that Ms. Burley "would require additional supervisory support, support which could not include over-the-shoulder scrutiny." (*Id.* at PageID#469.) Thus, she asserts that these additional limitations were erroneously excluded from the ALJ's RFC determination. (*Id.*)

The Commissioner contends that the ALJ's RFC finding is consistent with the state agency opinions. Specifically, the Commissioner asserts that, although worded differently, the ALJ's RFC finding "encompasses the essence of the limitations described" by the state agency consultants. (ECF No. 10, PageID#494.) The Commissioner further states that Ms. Burley's argument regarding the VE's testimony that there would be no jobs for an individual that required an isolated workstation, defined by her counsel as needing to work "without having contact" with the public, co-workers, or supervisors, is irrelevant because it is based on a limitation that neither the state agency psychological consultants nor the ALJ found. (*Id.* at PageID#495 (citing Tr. 66.)) The Commissioner also contends that Ms. Burley's argument regarding the VE's testimony that there would be no jobs for a person who would be "slower" than 20 percent of her coworkers is also irrelevant because the state agency consultants and the ALJ did not find such a limitation. (*Id.*) Thus, the Commissioner concluded that substantial evidence supports the ALJ's evaluation of the opinion evidence. (*Id.*) The Commissioner's arguments are well-taken.

With respect to the state agency findings, the ALJ stated:

> The undersigned has also considered the assessments of the State agency consultants, which they supported with review of the claimant's medical evidence of record. Exhibits 3A, 4A, 6A, and 8A. While the assessments of the State agency consultants were not entirely consistent, both opined the claimant has no more than moderate "paragraph B" limitations throughout. At the initial level, the State agency consultant opined the claimant had no limitations in her ability understand, remember, or apply information and in her ability to interact with others and moderate limitations in her ability to concentrate, persist, or maintain pace and ability to adapt or manage oneself. Upon reconsideration, the State agency consultant opined the claimant had moderate "paragraph B" limitations throughout. The assessments of the State agency consultants, finding the claimant had no more than moderate limitations, is consistent with the claimant's treatment records that indicate the claimant required no more than conservative mental health treatment throughout. Additionally, the claimant reported improvement in her conditions with medication. While the claimant has had some exacerbation of symptoms, her treatment records indicate that with medication management the depression and anxiety were generally "stable" and that she was "doing very well." Accordingly, the undersigned finds the assessments of the State agency consultants were persuasive.

(Tr. 30.)

Social Security Ruling ("SSR") 96-8p provides guidance to an ALJ developing an RFC. *See* Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims (SSR 96–8p), 1996 WL 374184, (July 2, 1996). Under SSR 96-8p, the RFC determination "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.*; *see Goode v. Berryhill*, No. 1:16-cv-2725, 2018 WL 1243425, at *3 (N.D. Ohio Mar. 9, 2018). "All of the relevant evidence," includes medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id.* at *5.

There is no requirement that the ALJ adopt the opinion "verbatim" if he finds that the opinion is persuasive. *Daniels v. Comm'r of Soc. Sec.*, No. 3:19-cv-02946, 2020 WL 6913490, at

*10 (N.D. Ohio Nov. 24, 2020); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("[T]here is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). But an ALJ must explain why the opinions were not adopted if the RFC conflicted with them. SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-cv-67, 2018 WL 6287996. At *5 (S.D. Ohio Dec. 3, 2018) ("[W]here, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so.") (citations omitted), *report and recommendation adopted* 2019 WL 95496 (S.D. Ohio Jan. 3, 2019).

The ALJ found that Ms. Burley was capable of work at the medium exertional level with additional limitations. (Tr. 26.) Specifically, the ALJ found that Ms. Burley should be limited to simple, routine, and repetitive tasks requiring only simple decision-making with no fast-paced production requirements, such as assembly line work or piecemeal quotas; no contact with the general public; and occasional contact with coworkers and supervisors. (*Id.*) The ALJ further found that Ms. Burley is capable of changes in the work environment, meaning changes in work responsibilities or workplace, that are explained in advance of implementation and implemented gradually over time. (*Id.*) Finally, the ALJ determined that, once work is assigned, the work should be able to be performed without working in close coordination with others and generally and the tasks should require working with things rather than people. (*Id.*)

Here, Ms. Burley does not establish how the ALJ did not accommodate for the limitations that the state agency consultant assessed. The state agency consultant assessed the following

26

limitations for Ms. Burley: (1) that she would require "a relatively isolated workstation and supervisory support when first learning job tasks" and (2) she could "relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder scrutiny." (Tr. 102.)

With respect to the supervisory support when first learning job tasks limitations, the ALJ was not required to include this limitation in the RFC. In *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015), the Sixth Circuit found that the ALJ did not err when omitting without explanation what a state agency reviewing doctor opined, despite the ALJ assigning "great weight" to that opinion. The court explained that only one state agency reviewing doctor assessed the omitted limitations, and the record did not support them. *Id.*

Here, the ALJ found the state agency opinions "persuasive" and was not required to include the supervisory support limitation in the RFC. This is so because only the state agency consultant at the reconsideration level assessed this limitation, and the record does not support the need for it. *Reeves*, 618 F. App'x at 275.

Reading the ALJ's decision as a whole, a subsequent reviewer could determine why Ms. Burley did not require a supervisory support when first learning job tasks limitation. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole.") The ALJ determined that Ms. Burley had no more than moderate limitations in her ability to understand, remember, or apply information. (Tr. 25.) In reaching this conclusion, the ALJ acknowledged that Ms. Burley alleged that she had difficulty remembering generally and completing tasks. (*Id.*) Yet the ALJ also observed that Ms. Burley was able to provide information about her health and described her prior work history. (*See* Tr. 320-21.) Upon consultative examination, Ms. Burley was also able to recall three out of three

27

objects and complete serial sevens. (Tr. 320.) Similarly, the ALJ also determined that Ms. Burley had no more than moderate limitations in her ability to concentrate, persist, or maintain pace. (Tr. 25.) The ALJ acknowledged that Ms. Burley alleged that she has limitations in concentrating generally, focusing generally, and completing tasks. (*Id.*) But, upon consultative examination, the ALJ noted that Ms. Burley exhibited good concentration and was able to complete serial seven subtraction. (Tr. 320.) While the ALJ could have more neatly packaged his findings, the ALJ's decision as a whole contains enough information to understand why the ALJ omitted from the RFC a supervisory support when first learning job tasks limitation. *See Heston*, 245 F.3d at 535.

The crux of Ms. Burley's argument appears to focus on whether the ALJ adequately accounted for the "relatively isolated workstation" limitation the state agency consultant assessed at the reconsideration level. The ALJ limited Ms. Burley to jobs that can be performed working with things and not people, as well as no contact with the general public and occasional contact with supervisors or co-workers. (Tr. 26.) The ALJ's limitation to no contact with the general public and occasional contact with supervisors and co-workers accounts for the relatively isolated workstation limitation. (*Id.*); *see Stamper v. Comm'r of Soc. Sec.*, No. 1:18-cv-697, 2019 WL 2437813, at *5 n.4 (N.D. Ohio May 8, 2019), *report and recommendation adopted*, 2019 WL 2437016 (N.D. Ohio June 11, 2019) ("In Social Security parlance, 'occasional' means 'occurring from very little up to one-third of the time'") (quoting Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5); *see also Davis v. Comm'r of Soc. Sec.*, No. 3:22-cv-1259, 2023 WL 4079200, at *8 (N.D. Ohio Mar. 30, 2023), *report and recommendation adopted*, 2023 WL 5214114 (N.D. Ohio Aug. 15, 2023) (finding that ALJ's RFC limitation to occasional contact with co-workers, supervisors, and the general public accounted for state agency consultant's limitation of a "relatively isolated workstation").

To the extent that Ms. Burley argues that the ALJ's limitation to "occasional interaction" is different from the state agency finding that she can "relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny" (Tr. 102), it is questionable whether there is any inconsistency. The term "superficial" is not defined under the *Dictionary of Occupational Titles* or *Selected Characteristics of Occupations*. *Betz v. Comm'r of Soc. Sec.*, No. 3:21-cv-2408, 2022 WL 17717496, at *9 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022); *see Beulah v. Comm'r of Soc. Sec. Admin*, No. 1:20-cv-02271, 2022 WL 1609236, at *20 (N.D. Ohio Mar. 25, 2022) ("[S]uperficial is not a defined term."), *report and recommendation adopted sub nom. Beulah v. Kijakazi*, 2022 WL 1606286 (N.D. Ohio May 20, 2022). Moreover, the Sixth Circuit has found meritless the argument that a limitation to occasional interactions was inconsistent with an opined limitation to superficial interactions. *Reeves*, 618 F. App'x at 275.

Assuming occasional interaction is inconsistent with superficial interaction, the evidence in the record does not demonstrate that Ms. Burley requires only superficial interaction with others. *Reeves*, 618 F. App'x at 275; *Davis*, 2023 WL 4079200, at *9 ("Even if the Court finds that *occasional* interaction is inconsistent with *superficial* interaction, Davis's argument fails because there is no evidence in the record that Davis requires only *superficial* interaction with others.") (emphasis in original). Further, the ALJ's decision, when read as a whole and with common sense, contains enough information that explains the ALJ's reason for omitting that limitation. *Heston*, 245 F.3d at 535. Although Ms. Burley alleged that she has difficulty in engaging in social activities, the ALJ observed that Ms. Burley spends time with others and live with others. (*See, e.g.,* Tr. 268.) The ALJ also noted that Ms. Burley, upon consultative examination, was able to consistently

remain on topic, elaborate when requested, and did not appear nervous during the evaluation. (Tr. 320.) Ms. Green noted in Ms. Burley's function report that Ms. Burley got along well with authority figures and had never been fired from a job because of problems getting along with other people. (Tr. 270.) Thus, the evidence does not support a finding that Ms. Burley needed a superficial interaction limitation. And the ALJ's decision as a whole is sufficient to understand why the ALJ omitted that limitation and why the ALJ adopted the state agency assessed limitations that were supported by the evidence in the record.

Ms. Burley claims that "[w]hen the vocational witness was asked the effect of needing an isolated workstation, he testified that there were only three jobs classified as working in isolation." (ECF No. 7, PageID#468.) But this argument overlooks that her cited testimony was based on her own counsel's definition of an isolated workstation, which he defined as needing to work "without having contact" with the public, co-workers, or supervisors. (Tr. 66.) The state agency consultant, however, did not find such a limitation. In fact, the state agency consultant, regarding Ms. Burley's sustained concentration and persistence limitations, opined that Ms. Burley would need "a relatively isolated workstation and supervisory support when first learning job tasks." (Tr. 102.) And with respect to Ms. Burley's social interaction limitations, the state agency consultant opined that Ms. Burley can "relate adequately on a superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder scrutiny." (*Id.*) Moreover, as stated above, the ALJ limited Ms. Burley to jobs that can be performed without working in close coordination with others and which entail working with things and not people, as well as no contact with the general public and occasional contact with supervisors or coworkers. (Tr. 26.) Despite the ALJ's different wording, Ms. Burley does not demonstrate how the ALJ's RFC finding is inconsistent with the state agency limitations. Rather, her citation to the testimony

appears to demonstrate that counsel provided a broader limitation to the VE than what the state agency consultant opined or what the ALJ found. (*See* Tr. 66.)

Next, Ms. Burley attempts to connect another piece of testimony elicited from the VE from her counsel's hypothetical. Specifically, she contends that the VE opined that there would be no jobs for a person who would be "slower" than 20 percent of her coworkers. (Tr. 66.) She tries to connect it to the state agency findings, but she does not demonstrate the relevance of this testimony or explain how one could conclude that this definition is linked to the state agency findings. Indeed, the state agency psychological consultant did not opine that she would be "slower" than 20 percent of her coworkers. This appears to be Ms. Burley's counsel's definition rather than one imposed by either the state agency consultants or the ALJ. (*See* Tr. 26, 84 (state agency consultant opining that Ms. Burley would need structured work setting with focus on standard repetitive tasks that are not based on fast-paced production quotas), 93 (same), 102 (state agency consultant opining that symptoms would be exacerbated in the face of perceived stressors but Ms. Burley can adapt to a setting in which duties are routine and predictable and in which changes are infrequent, explained in advance, and introduced slowly), 111 (same).) The ALJ found that Ms. Burley should be limited to simple, routine, and repetitive tasks requiring only simple decision-making with no fast-paced production requirements such as assembly line work or piecemeal quotas. (Tr. 26.) The ALJ further found that Ms. Burley is capable of changes in the work environment, meaning changes in work responsibilities or workplace, which are explained in advance of implementation and implemented gradually over time. (*Id.*) Because Ms. Burley does not explain how the ALJ was expected to explain limitations that state agency consultants did not find or how the ALJ's RFC determination was inconsistent, I recommend that the Court reject this sub-claim because it lacks merit.

Ms. Burley does not demonstrate how the ALJ's evaluation of the opinion evidence is not supported by substantial evidence. She further does not demonstrate the relevance of the testimony on which she relies to establish error. Because Ms. Burley does not demonstrate error, I recommend that the Court reject this assignment of error.

### 2. *Substantial Evidence Supports the ALJ's SSR 16-3p Evaluation of Ms. Burley's Subjective Symptoms.*

Ms. Burley argues that the ALJ erred in his evaluation of her subjective complaints. Specifically, she asserts that the ALJ "failed to properly apply the criteria of Social Security Ruling [SSR] 16-3p and failed to find that the intensity, persistence, and limiting effects of the totality of [her] symptoms precluded her from [working] on a full-time and sustained basis." (ECF No. 7, PageID#471.) She additionally contends that the ALJ failed to consider the entire record regarding the waxing and waning of her symptoms. (*Id.* at PageID#474 (citing *Keyse v. Saul*, No. 1:19cv2495, 2021 WL 1214691, at *20 (N.D. Ohio Mar. 31, 2021)). For the following reasons, these arguments lack merit.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2017 WL 5180304, at *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the

claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7-8; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The ALJ's decision here reflects that he followed SSR 16-3p's procedure for evaluating a claimant's subjective complaints. The ALJ outlined the regulatory requirements for evaluating subjective symptoms. (Tr. 26-27.) The ALJ then described Ms. Burley's testimony regarding her subjective symptoms and limitations. (Tr. 27.) After discussing Ms. Burley's allegations, the ALJ assessed Ms. Burley's subjective complaints and cited to several relevant SSR 16-3p factors. For example, the ALJ discussed the objective medical evidence and concluded that while Ms. Burley's impairments caused limitations, the record did not support finding that these limitations were totally disabling. (*See* Tr. 27-28.); *see* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"). Specifically, the ALJ noted that at an April 2020 examination, Ms. Burley had anxious mood, but had full affect and thought content, cognition, perception, and judgment within normal limits. (Tr. 27; *see* 329.) The ALJ also discussed Ms. Burley's July 2021 consultative examination. (Tr. 28.) The ALJ stated that, upon examination, Ms. Burley was well-groomed and answered all examiner questions, consistently remaining on topic. (Tr. 28; *see* Tr. 320.) She had appropriate mood and affect, and she did not appear nervous during the evaluation. (Tr. 320.) She also exhibited good concentration, which was evidence by her ability to maintain good eye contact, answer examiner questions, and consistently

remain on topic. (*Id*.) She was also able to recall three of three simple objects after fifteen minutes and complete serial seven subtraction down to two. (*Id*.) She was also able to recall five digits forward and four digits backward. (*Id*.) The ALJ noted treatment records where Ms. Burley described her moods as stable. (Tr. 27-28; *see* Tr. 339, 413.)

The ALJ's decision also contained discussion of Ms. Burley's treatment, which included the conservative nature of Ms. Burley's treatment. 20 C.F.R. § 404.1529(c)(3)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If the … extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, … we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). Specifically, the ALJ observed that Ms. Burley has required no associated emergent, inpatient, or day program treatment related to her mental health conditions. (Tr. 28.) It was appropriate for the ALJ to consider the conservative nature of Ms. Burley's mental health treatment and rely on it as a basis upon which to discount her subjective symptom complaints. *Sherwood v. Commissioner of Soc. Sec.*, No. 3:20-cv-1037, 2021 WL 8342807, at *17 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, 2023 WL 6348207 (N.D. Ohio Sept. 29, 2023) ("The ALJ could consider the conservative nature of [the claimant's] treatment and rely on it as a basis upon which to discount his subjective symptom complaints."); *Tweedle v. Comm'r of Soc. Sec.*, 731 F. App'x 506, 508 (6th Cir. 2018) ("[T]he ALJ appropriately considered [the claimant's] conservative treatment history in discounting his claim of disabling pain."); *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 638-39 (6th Cir. 2016) (affirming the ALJ's discounting of the claimant's subjective allegations where the claimant "received only routine and/or conservative treatment for the allegedly disabling impairments").

The ALJ also discussed Ms. Burley's treatment, including reports of improvement with treatment. *See* 20 C.F.R. § 404.1529(c)(3)(iv) (ALJ should consider "type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms."). For example, the ALJ observed that at a January 2021 session, Ms. Burley reported that things were going better and that her medications were helpful in managing her mood and anxiety. (Tr. 27-28; *see* Tr 334.) The ALJ also noted that Ms. Burley reported in March 2021 that she felt "very good" when taking Celexa. (Tr. 28; *see* Tr. 339.) At an October 2021 telemedicine appointment, Ms. Burley asserted that she was "doing very well" and that her moods and depression were "stable" despite reporting some struggle with focus and concentration. (Tr. 28; *see* Tr. 395.) In January 2022, Ms. Burley stated she felt her medication regimen worked "pretty good for her." (Tr. 28; *see* Tr. 413.) Despite feeling down, she attributed this more to "situational things" and the time of year. (Tr. 413.) And while slightly more depressed, her moods had been stable, and she was not manic at all. (*Id.*) Further, the ALJ also observed that at another appointment in January 2022, treatment records indicated that Ms. Burley has a history of depression, anxiety, and insomnia, but "good results [with] medicines."[9] (Tr. 28; *see* Tr. 406.)

To the extent that Ms. Burley disputes that her conditions were improved with medication management, a review of the longitudinal evidence of the record as discussed in great detail above supports the ALJ's conclusion. Ms. Burley's reports of improvement with treatment were another appropriate factor that the ALJ could consider in assessing her subjective symptom complaints. *James v. Comm'r of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 4172932, at *16 (N.D. Ohio June 5, 2023) (finding that SSA regulations and caselaw support discounting a claimant's report of symptoms where medication alleviates symptoms); *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x

---

[9] The ALJ stated that this appointment took place in March 2022 (Tr. 28), but the treatment note indicates Ms. Burley saw Dr. Chrobak in January 2022. (*See* Tr. 406.)

370, 371 (6th Cir. 2011) (finding ALJ properly considered that medication helped relieve claimant's symptoms).

The ALJ also discussed Ms. Burley's noncompliance with her treatment. The ALJ observed occasions where Ms. Burley forgot to make follow-up appointments to refill her medication or admitted to not taking her medication consistently. Specifically, the ALJ observed that in March 2021, Ms. Burley reported an exacerbation of symptoms, but also noted that she was out of Celexa. (Tr. 339.) Moreover, in January 2022, Ms. Burley admitted at her follow-up appointment that she "never took her medication consistently," but that her moods have been stable. (Tr. 413.) The ALJ observed that despite Ms. Burley not always being compliant with her medications, Ms. Burley "generally indicates that her mental health conditions improve[] with medication management." (Tr. 28.) Ms. Burley's noncompliance with her treatment was another appropriate factor that the ALJ could consider when assessing her subjective symptom complaints. SSR 16-3p (stating ALJ may discount credibility "if the individual fails to follow prescribed treatment that might improve symptoms."); *Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) (finding claimant's "failure to pursue treatment greatly erodes her credibility"); *see Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010) ("Impairments that are controllable or amenable to treatment cannot support a finding of disability.").

While Ms. Burley contends that the ALJ did not consider the "waxing and waning" of her symptoms, the ALJ's decision reveals that the ALJ did in fact consider the variability of Ms. Burley's symptoms. Indeed, the ALJ noted instances where Ms. Burley's mental health conditions were exacerbated. (Tr. 28; *see* Tr. 339 (March 2021 appointment where Ms. Burley reported an exacerbation of symptoms but also noted that she was out of Celexa)). But as demonstrated above, the ALJ also discussed moments where Ms. Burley's reported her symptoms improved with

medication management. (Tr. 27-28; *see* Tr. 334, 339, 395, 413.) Even when assessing the state agency opinions, the ALJ acknowledged that Ms. Burley "has had some exacerbation of symptoms," but noted that the treatment records "indicate that with medication management the depression and anxiety were generally 'stable' and that she was 'doing very well.'" (Tr. 30.)

Overall, the ALJ's decision reflects that the ALJ properly applied the criteria of SSR 16-3p by discussing the objective medical evidence and Ms. Burley's treatment, which included the conservative nature of her treatment, her reports of improvement with medication, and noncompliance with her treatment. (*See* Tr. 27-29.) Ms. Burley challenges the SSR 16-3p evaluation by reiterating arguments made elsewhere in her merits brief and reciting her reported symptoms and allegations, and then concluding that the "evidence in this matter established that [she] satisfied the criteria set forth in [SSR] 16-3p." (ECF No. 7, PageID#471-475.) However, her argument does not satisfy the substantial evidence standard. Instead, her argument is "essentially asking this Court to reweigh the evidence and issue a *de novo* determination." *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at *8 (N.D. Ohio June 18, 2015). But the Court cannot do so.

While Ms. Burley presents conflicting evidence in the record that might suggest further limitations, under the substantial evidence standard, "administrative findings 'are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.'" *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1995)). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). As detailed above, the ALJ presented inconsistencies that provide substantial evidence for the ALJ's

determination that Ms. Burley's subjective symptom allegations were not supported by the record.

Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's

decision.

Dated: December 20, 2023                               s/ *Jennifer Dowdell Armstrong*
                                                       Jennifer Dowdell Armstrong
                                                       U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the

District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).

Objections must be specific and not merely indicate a general objection to the entirety of the

report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).